IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:22-cr-74 |
| | ) | |
| RONZEL MONTE DIXIE, | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF UNITED STATES ON SENTENCING

The United States of America – by and through its attorneys – hereby represents that it has reviewed the probation office's presentence report (hereinafter "PSR") and that it has no objections to the facts and conclusions in the report. For the reasons to follow, the United States respectfully requests that the Court sentence RONZEL MONTE DIXIE, the defendant herein, to five consecutive life sentences plus 60 years of incarceration.

- Count 3: life imprisonment on the brandishing of a firearm during the drug robbery of Angel Vaughn to run consecutive to all other terms of incarceration.

- Count 6: life imprisonment on the brandishing of a firearm during the drug robbery of Mark Easley to run consecutive to all other terms of incarceration.

- Count 12: life imprisonment on the brandishing of a firearm during the commercial robbery of a Hampton MetroPCS to run consecutive to all other terms of incarceration.

- Count 18: life imprisonment on the brandishing of a firearm during the commercial robbery of a Newport News MetroPCS to run consecutive to all other terms of incarceration.

- Count 20: life imprisonment on the use of a firearm resulting in the death of Darrell Higginbotham during the commercial robbery of the Happy Shopper convenience store to run consecutive to all other terms of incarceration except Count 10 which will merge with Count 20 and run concurrent.[1]

---

[1] See *Lara v. United States*, 599 U.S. 453 (2023) (holding that the consecutive sentence requirement of 18 U.S.C. § 924(c) does not apply to a sentence imposed under 18 U.S.C. § 924 (j). Therefore, the Court has discretion to run them consecutively or concurrently. See *United*

- Counts 1, 2, 5, 9, 11, and 17: 20 years of incarceration to run concurrent to each other on the conspiracy, the robbery of Angel Vaughn, the robbery of Mark Easley, the robbery of the Happy Shopper, the robbery of the Hampton MetroPCS, and the robbery of the Newport News MetroPCS.

- Count 7: ten consecutive years of incarceration for illegally possessing a firearm and ammunition to murder Taari Johnson.

- Count 8: ten consecutive years of incarceration for illegally possessing a firearm and ammunition to shoot Omidwar Singh and murder Darrell Higginbotham.

- Count 13: ten consecutive years of incarceration for illegally possessing a firearm and ammunition to murder Kelcey Wellons and shoot Jaison Brooks.

- Count 16: ten consecutive years of incarceration for illegally possessing a firearm and ammunition to murder Nathaniel Davis, shoot at Marcus Morgan, and murder David Jackson.

Therefore, the United States recommends the Court impose a total sentence of five consecutive life sentences plus 60 years in prison.

The defendant epitomizes danger to the community. He is a serial killer who boasted about his murders, described them as "practice," and targeted victims at random. He killed Taari Johnson over nothing more than perceived disrespect at a bar. Less than one day later, he executed Darrell Higginbotham because he witnessed one of his commercial robberies. Weeks later, he murdered a pedestrian, Kelcey Wellons, to increase his body count. Days after that, he murdered a homeless man, David Jackson, just to demonstrate to another member of the group that his gun does not jam. In between all of these murders, he went on a stunning blizzard of violence robbing drug dealers and commercial establishments. The defendant's behavior shows no regard for human life, the

---

*States v Huskey* 90 F.4th 651, 676 (4th Cir, 2024) ("the district court plainly erred when it found that it was required to impose a mandatory consecutive sentence for [the defendant's] § 924 (j) offense").

community, or the rule of law.  Five consecutive life sentences plus 60 years are the minimum necessary to account for the statutory sentencing factors.

## PROCEDURAL HISTORY

On March 13, 2023, a grand jury in the Newport News Division returned a Second Superseding Indictment, charging the defendant, KWAIMAIN SHY'DE REDMON, and MEKO MONTEZ BROWN, JR.  (ECF No. 55.)  The defendant was charged with conspiracy to commit Hobbs Act robbery, six counts of Hobbs Act robbery, six corresponding counts of use, carry, brandish, and/or discharge a firearm during the robberies; five counts of felon in possession of firearm; and use of a firearm resulting in death.  (ECF No. 55.)   REDMON was charged with conspiracy to commit Hobbs Act robbery, two counts of Hobbs Act robbery, two corresponding counts of use, carry, brandish, and/or discharge a firearm during the robberies; three counts of felon in possession of a firearm; and one count of use of a firearm resulting in death.  BROWN was charged with conspiracy to commit Hobbs Act robbery; three counts of Hobbs Act robbery; three corresponding counts of use, carry, and brandish a firearm during the robbery; one count of felon in possession of a firearm; and one count of obstruction of justice.  (ECF No. 55.)

The trial of this case began on May 22, 2024, and lasted approximately three weeks. On June 10, 2024, a jury convicted the defendant of all of the charged offenses save three. (ECF No. 421.)  On June 10, 2024, a jury convicted the defendant of the conspiracy, five counts of robbery, five counts of the corresponding firearm offense, four counts of illegally possessing a firearm as a convicted felon, and use of a firearm resulting in death.  (ECF No. 421.)  Sentencing in this matter is scheduled for January 30, 2025.

The PSR calculated the defendant's total offense level as 43.  PSR ¶ 162.  The defendant's criminal history category is V.  PSR ¶ 223.  The defendant's advisory guideline range is 1,920 months

plus 456 months consecutive, plus any number of years up to life, consecutive.  PSR ¶ 223.  This calculation is based upon adding the mandatory minimum penalties plus total statutory maximum penalties for the other violations.

## OFFENSES OF CONVICTION

The crimes of conviction and relevant conduct are abhorrent.  The defendant's participation in the conspiracy began in or about September 2017 and continued until his arrest in November 2017.

### A.    The Happy Shopper Robbery/Murder (Counts 8-10, 20)

Coconspirator Antonio Doane testified that he called the defendant on October 16, 2017, to perpetrate a robbery because he needed money.  Doane Tr. 45-46.  Doane went to a residence associated with REDMON to meet REDMON and the defendant.  *Id*. at 46.  The defendant, REDMON, and Doane used a Ruger P95 9mm firearm in the robbery, which was taken from a female associate of Doane, Tedra Griffin.  *Id*.  The group drove a blue Ford Expedition that belonged to another female associate of Doane, Derrica Hardy.  *Id*. at 20.  The defendant, REDMON, and Doane drove around Hampton in the Expedition on the evening of October 16, 2017, scouting several convenience stores as potential robbery targets.  *Id*. at 48.  They stopped at 7-Eleven and other locations that had "too many lights and cameras" until the group found the Happy Shopper as it was closing.  *Id*.  The defendant, REDMON, and Doane approached the Happy Shopper in Hardy's Expedition as two individuals were leaving the business.  *Id*. at 49.  Doane and REDMON initially confronted Darrell Higginbotham, but he did not have any money, so Doane told him to lie down.  *Id*. at 49, 52.

Doane testified that he turned his attention to the other man, Omidwar Singh.  Doane told Singh to "give [him] all he got and don't move."  *Id*. at 49.  At this point, Doane brandished the firearm and shot Singh.  Doane explained that he was nervous, and Singh moved.  *Id*. at 50.  After

4

the shooting, Doane returned briefly to the Expedition, and the defendant got out of the vehicle to assist REDMON and Doane. *Id*. at 50, 54. REDMON rummaged through Singh's van. *Id.* REDMON completed the robbery by stealing a pair of pants from Singh's vehicle because he thought proceeds from the business were in them.[2] *Id.* Doane passed the Ruger firearm to REDMON who further passed it to the defendant. *Id.*

Shortly thereafter, the three robbers converged over Higginbotham who was lying prostrate in the parking lot. *Id.* Doane testified that "DIXIE stood overtop of the old guy, shot him twice, and [they] all jumped in the truck." *Id.* Doane drove the getaway vehicle. *Id.* at 55. As the group went to leave, Singh drove away from the scene in his van. *Id.* While driving away in the Expedition, REDMON was frustrated with the defendant for the murder because "he felt like it was for no reason." *Id.* at 50, 55. At this point, the group realized the pants they stole did not contain any money. *Id.* at 55.

After fleeing the scene, Doane drove the defendant and REDMON to a residence near Big Bethel Road in Hampton associated with two females Doane knew as "Dasia and Dedrea." *Id.* at 56. Doane identified Government Exhibit 197 (picturing 454 Hollomon Drive) as that residence. *Id*.

Officer Demarest from Hampton Police Division testified that he responded to the 7-Eleven on North King Street on the evening of October 16, 2017, in response to a complaint of a shooting. Day 3 Tr. at 28. Officer Demarest found Singh in his van suffering from a gunshot wound to the left eye. Gov. Ex. 163. Officer Hicks from Hampton Police Division responded to the Happy Shopper gas station where he found a group of people towards the west side of the parking lot

---

[2] As discussed more below, this was not the first occasion where the group stole pants. In an earlier drug robbery of Mark Easley, the defendant and Doane also took Easley's pants. Doane Tr. 29.

standing around a body lying on the ground. Day 3 Tr. at 36. Officer Hicks found Higginbotham's dead body and two shell casings in close proximity. Gov. Ex. 107, 108.

Detective Giles from Hampton Police Division recovered surveillance of the robbery and homicide at the Happy Shopper. *Id*. The surveillance video showed two men, Higginbotham and Singh, leave the Happy Shopper at approximately 11:29 p.m. on October 16, 2017. Day 3 Tr. 57; Gov. Ex. 147. Detective Giles testified that the surveillance showed two suspects approach Higginbotham as he was walking in the parking lot of the Happy Shopper. Day 3 Tr. 59; Gov. Ex. 148. In the meantime, Singh got into his minivan and backed up to check on Higginbotham. Day 3 Tr. 61; Gov. Ex. 149. One of the suspects turned his attention to Singh in the van. Gov. Ex. 149 at .17. After approximately 20 seconds, the van lurched backward. Gov. Ex. 149 at .40. Detective Giles testified the suspects opened the door to Singh's van. Day 3. Tr. 62; Gov. Ex. 155. Thereafter, the three suspects converged over Higginbotham as he was lying in the parking lot. Day 3 Tr. 63; Gov. Ex. 157. Two of the men were going through Higginbotham's pockets while a third was standing above him. Day 3 Tr. 63. One suspect then shot Higginbotham while standing "overtop of him." Day 3 Tr. 63; Gov. Ex. 158 (depicting muzzle flash). After the murder, the three suspects fled to the getaway vehicle and departed the area by driving across the parking lot of the Happy Shopper to North King Street. Gov. Ex. 159. Detective Giles identified the getaway vehicle as a Ford Expedition. Day 3 Tr. at 58. While under cross examination, Detective Giles testified that the state investigation revealed that a pair of pants was taken from Singh's vehicle. Day 3 Tr. 68.

Singh testified about the robbery of the Happy Shopper, telling jurors that he was shot in the left eye. Singh Tr. 5. As a result of the shooting, he has had trouble sleeping, memory issues, pain in his head and face, changes in his personality, and difficulty speaking. *Id*. at 5-7. In the fall

of 2017, Singh was working at the Happy Shopper. *Id.* at 10. Higginbotham was not on the payroll for the Happy Shopper, but he would do odd jobs for Singh in exchange for beer, soda, or cigarettes. *Id.* at 12-13. Because of memory issues, Singh could not identify a picture of Higginbotham, but he recalled his name was Darrell. *Id.* at 13-14. On the night of the robbery, Singh and Higginbotham had just closed the business. *Id.* at 17. Singh was in possession of a backpack with store proceeds, a firearm, and keys to the business. *Id.* at 18. Singh saw some people approach Higginbotham in the parking lot, so he backed up his minivan and asked them, "What's wrong? Everything okay?" *Id.* at 20. One of the men approached Singh's van, brandished a firearm with two hands, and pointed the weapon at Singh in the vehicle. *Id.* at 21. Singh recalled the man's hands shaking before he discharged the weapon, shooting him in the left eye. *Id.* Singh saw blood splatter on his windshield, and he used a napkin to apply pressure to his eye. *Id.* at 22. Singh could not recall if his van lurched backward after the shooting. *Id.* at 23, 29. He also could not recall if the shooter asked for anything before firing or opened the door to his van to rummage in the vehicle. *Id.* at 24, 29. Singh testified that he heard two shots as he drove away from the Happy Shopper. *Id.* at 29. Singh said the person who shot him was a man that was taller than him, but he could not identify the skin color of the shooter or any other identifying features. *Id.* at 30. After the shooting, Singh was hospitalized for several surgeries over five to six days, and he thought the Happy Shopper business closed for one to two days. *Id.* at 32-33.

The Medical Examiner, Dr. Hays, performed an autopsy of Higginbotham's body. Day 3 Tr. at 76. He identified two gunshot wounds to the head – (i) one that entered behind the ear and stopped inside the head and (ii) another that entered in front of the ear and exited the head and passed through the right arm. Day 3 Tr. 84; Gov. Ex. 138 at 4. Based on the nature of the wounds, Dr. Hays opined that one of the gunshot wounds was from intermediate range – that is, the firearm

was not in contact with the body when fired, but not very far away. Day 3 Tr. at 85. Dr. Hays further opined that Higginbotham's cause of death was a gunshot wound to the head with a gunshot wound to the head and left arm as a contributing factor. Gov. Ex. 138; Day 3 Tr. at 88.

**B.    The Shooting of Taari Johnson (Count 7)**

In the early morning hours of October 16, 2017 – a little less than 24 hours prior to the Happy Shopper robbery and murder – Doane, the defendant, and REDMON illegally possessed a firearm and ammunition to shoot and kill Taari Johnson.

Doane testified that he received a phone call from the defendant summoning him to "pull up" because they "had a problem." Doane Tr. at 33. Doane brought the Ruger P95 firearm because of the "problem." *Id*. at 34. Doane drove Hardy's Expedition to meet REDMON and the defendant at a bar, Hoss's Deli, in Newport News. *Id*. In retrospect, Doane testified that the "problem" may have been invented to get him out of the house, but at the time, he thought they needed a firearm for a "real live problem." *Id*. at 35.

Surveillance from Hoss's Deli at the time in question shows three men walking around the parking lot. Gov. Ex. 80. Doane identified these three men as himself, the defendant, and REDMON. Doane Tr. at 38. Doane testified that the group returned to Hardy's Expedition, a motorcycle left the bar, and they followed in pursuit. *Id*. at 42. Doane drove. *Id*. The defendant had the Ruger firearm. *Id*. REDMON was in the backseat. *Id*. Initially, Doane was going to knock the victim off his bike, but he instead pulled even with the motorcycle, and the defendant "shot him off the bike." *Id*. Doane recalled the defendant firing approximately three times. *Id.* at 43. After the shooting, Doane turned the vehicle around and stopped near the victim. *Id*. at 42. The defendant and REDMON got out of the vehicle and searched the man's pockets. *Id*. at 42. The defendant fired at the victim another time as he lay on the ground. *Id*. at 45.

8

Doane testified that he took REDMON and the defendant back to the Pilot House apartment associated with REDMON after the shooting.  *Id*.  Doane returned to Hardy's residence in the Aqueduct Apartments in Newport News.  *Id*.

Officer Hughes from Newport News Police Department was the first law enforcement officer to respond to the scene of the shooting.  Day 3 Tr. at 90.  Officer Hughes found the motorcycle in the roadway on its side and Johnson under the bike.  *Id*. at 94.  Detective Wachsmuth obtained surveillance from the Hoss's Deli and the Lockhaven Apartments.  *Id*. at 100, 102, 106.  The surveillance from Lockhaven showed a Sport Utility Vehicle gaining on a motorcycle just before the overpass for Interstate 64 on Old Oyster Point Road.  *Id*. at 108-09; Gov. Ex. 82.

Derrica Hardy testified that she was the registered owner of a blue 1998 Ford SUV with a Virginia license plate ending in 2753.  Day 3 Tr. 117-18; Gov. Ex. 194-95.  In the fall of 2017, Hardy was in an intimate relationship with Doane.  Day 3 Tr. 116.  She testified that if Doane took her vehicle to any of the crimes at issue, it was without her awareness, but that it was possible he did so.  Day 3 Tr. 124, 127.  Hardy knew that Doane was friends with someone named "Bone" and identified "Bone" as a picture of the defendant.  Day 3 Tr. 121; Gov. Ex. 530A.

Tedra Griffin was also in an intimate relationship with Doane.  Day 3 Tr. 128.  Griffin testified that she was the registered owner of a Ruger, Model P95, 9mm firearm.  Day 3 Tr. 130; Gov. Ex. 191.  She purchased the firearm from Superior Pawn in Norfolk on December 31, 2008.  Day 3 Tr. 132; Gov. Ex. 191A.  Griffin identified the firearm pictured in Government Exhibit 200 as her Ruger 9mm handgun.  Day 3 Tr. 133.  Griffin reported the firearm stolen in October of 2017 after Doane took it from her without her consent.  Day 3 Tr. 135, 140.  When Griffin confronted Doane about taking the gun, Doane told Griffin that he "did some bad things."  *Id*.  Notably,

Griffin knew Doane to hang out with two people with the nicknames "Kwa" and "Bone."  Day 3 Tr. 145.

### C.    The Drug Robbery of Mark Easley (Counts 5-6)

On October 12, 2017, Doane and the defendant robbed a drug dealer, Mark Easley, and his girlfriend.  Doane testified that he and the defendant robbed a "weed man" with the nickname "YB" to "get money to get Kwaimain [REDMON] out of jail on bond."  Doane Tr. 25.  Doane identified Easley's photograph as the man he knew as "YB."  Doane Tr. 24; Gov. Ex. 530I.  Doane had a history of buying marijuana from Easley.  Doane Tr. 25.  Doane and the defendant arranged a purported drug transaction with Easley in a parking lot near the Patrick Henry Mall in Newport News as a pretext to rob him for money and drugs.  *Id*.  REDMON needed bail money because he had been arrested after a high-speed chase with police.  *Id*. at 26.  Doane and the defendant used the Ruger P95 firearm to rob Easley.  *Id*.  Prior to the robbery, Doane gave the Ruger to the defendant who brandished it and demanded money and drugs from Easley.  *Id*. at 27-28.  The defendant and Doane took money, phones, a watch, marijuana, cocaine, and MDMA from Easley.  *Id*. at 28-29.  The defendant took Easley's pants from him during the course of the robbery.  *Id.* at 29.  The defendant used the money obtained from Easley to pay the bond to get REDMON released from state custody.  *Id*. at 30.

The victim, Easley, corroborated Doane's account of the drug robbery.  He testified that he was a dealer of marijuana and other drugs in the fall of 2017.  Day 5 Tr. 51-52.  According to Easley, Doane and another man robbed Easley and his girlfriend in Easley's car near the Patrick Henry Mall in Newport News.  *Id*. at 52.  The man who accompanied Doane pointed the barrel of

a firearm at Easley and demanded everything he had on his person. *Id*. at 56. Doane and his associate took Easley's pants, his watch, drugs, and some currency. *Id*. at 58.

The United States presented additional evidence corroborating the drug robbery of Easley. Following the robbery, the defendant used the money to pay the bond to have REDMON released from state custody. The bail paperwork reflected that the Magistrate signed the bond for REDMON's release at 11:12 p.m. on October 12, 2017 – only hours after the robbery of Easley. Gov. Ex. 74. While incarcerated, REDMON also made several recorded phone calls to his significant other and the defendant. On a call at 7:59 p.m. on October 12, 2017 – only a short time after the robbery – the defendant told REDMON that Doane put him "on one acting all scary" and the defendant added that he "showed his people some love, I'm telling you right now, you hear me?" Gov. Ex. 72.

### D.    Arrest of DOANE and Further Investigation

On October 23, 2017, Doane was arrested on a federal warrant for violating his Supervised Release by the United States Marshal Service and officers from the Newport News Police Department. Day 4 Tr. at 13. He was found in possession of the Ruger P95 firearm and ammunition. *Id*. at 16; Gov. Ex. 200 (Ruger handgun); Gov. Ex. 204 (magazine); 206-207 (ammunition). The Ruger firearm was collected by the police and sent to the lab for testing. Forensic Scientist Schiermeier-Wood could not exclude Doane as a match to the DNA mixture profile recovered on the firearm. Day 8 Tr. 101-02; Gov. Ex. 231. The defendant and REDMON were eliminated as contributors to the mixture profile, Gov. Ex. 343, but Forensic Scientist Posto testified this did not mean they did not handle the firearm. Day 8 Tr. 104-05.

Crime Scene Technician Walker recovered two 9mm cartridge casings near Higginbotham's body at the Happy Shopper convenience store. Walker Tr. 16; Gov. Ex. 124-127.

Technician Walker recovered another 9mm cartridge casing from Singh's minivan. Walker Tr. 32; Gov. Ex. 180. During an autopsy, Dr. Hays recovered ammunition components from the body of Higginbotham. Gov. Ex. 141, 143, 145. Forensic Scientist Etzelmiller analyzed the casings found at the Happy Shopper and in Singh's van. She found that all three of these casings were fired by the Ruger P95 firearm recovered from Doane. Day 4 Tr. 45; Gov Ex. 226.

Crime Scene Technician Moore recovered one 9mm cartridge case near Johnson's motorcycle in the early morning hours of October 16, 2017. Day 3 Tr. 152; Gov. Ex. 88-89. Technician Moore later recovered another 9mm cartridge case. Day 3 Tr. 158-59; Gov. Ex. 94. The Medical Examiner recovered bullet fragments from Johnson's body. Day 3 Tr. 161; Gov. Ex. 101, 103. Forensic Scientist Etzelmiller analyzed the casings and ammunition components and the two cartridge casings found at the scene of the shooting of Johnson. She found that the two casings and one ammunition component from Johnson's body were fired by the Ruger P95 firearm. Day 4 Tr. 39; Gov. Ex. 225.

On October 25, 2017, Technician Moore processed Hardy's Ford Expedition. Day 3 Tr. 163-165. Technician Moore lifted latent fingerprints from the Expedition. Day 3 Tr. 163; Gov. Ex. 223. Forensic Scientist Baldwin analyzed the latent fingerprints and made five identifications of Doane's fingerprints, made one identification of the defendant's fingerprints, and found several inconclusive determinations of possible matches to Doane, REDMON, and the defendant. Day 4 Tr. 69-71; Gov. Ex. 232.

Finally, Investigative Analyst Paul Swartz testified about call-detail records, cell-site location information, and other phone evidence linking the defendants to the criminal conduct. With respect to the Happy Shopper robbery, a phone associated with the defendant was approximately .22 miles from the Happy Shopper at 11:21 p.m. on October 16, 2017 – only

minutes before the robbery and homicide. Day 5 Tr. at 121; Gov. Ex. 549 at 5. There were also phone calls between the defendant, REDMON, and Doane on the evening of October 16, 2017, in the hours before the Happy Shopper robbery. Day 5 Tr. 120; *Id*. at 7. With respect to the shooting of Johnson in the early morning hours of October 16, 2017, there were phone calls and text messages between the defendant and Doane after the shooting, including a message from the defendant to Doane about thirty minutes after the murder which said, "Kwai said we good" and a response from Doane to the defendant, "U sure cuz." Day 5 Tr. 119; Gov. Ex. 550 at 6. And as to the drug robbery of Easley, phones associated with Doane and the defendant were in the vicinity of the parking lot near Patrick Henry Mall where the robbery occurred at approximately 5:15 p.m. when the robbery took place. Day 5 Tr. 114-116; Gov. Ex. 555 at 2-3. There were also a number of calls between the defendant and Doane on the evening of October 12, 2017. Day 5 Tr. 116; Gov. Ex. 555 at 2.

  **E. Drug Robbery of Angel Vaughn**

  On October 1, 2017, coconspirator Raymond Calhoun, the defendant, and REDMON robbed drug dealer Angel Vaughn in Newport News. Calhoun testified that he, the defendant, and REDMON drove a stolen black Ford Taurus to the Vaughn robbery. Day 6 Tr. 136. Calhoun explained that he, the defendant, REDMON, and another man stole the Taurus from a 7-Eleven in Hampton. *Id*. at 134. Calhoun identified that Taurus as Government Exhibit 22. *Id*. at 133-34. Prior to his arrest, Doane testified that he saw the defendant and REDMON driving a black Ford Taurus, which he identified as Government Exhibit 22. Doane Tr. at 30-31.

  This black Taurus was stolen from Karen Riddick and James Groggins who left it running at a 7-Eleven in Hampton on September 28, 2017. Day 4 Tr. 125. On October 9, 2017, Officer Tyler from the Hampton Police Division attempted to stop the Ford Taurus in a marked police

vehicle. Day 4 Tr. 140-41. The driver of the Taurus, the defendant, did not stop and went on a high-speed chase from police. Day 4 Tr. 142-43. The chase ended after the Taurus fled across the city line to Newport News, but the vehicle was soon thereafter found abandoned. Day 4 Tr. 152-53. The Taurus was processed for fingerprints, and Master Forensic Specialist Burhman identified a latent fingerprint matching the defendant on the Taurus. Day 4 Tr. 188-89; Gov. Ex. 30. Additionally, during the chase of the Taurus, Officer Dipentima from the Hampton Police Division witnessed the Taurus drive past her location and saw the driver of the vehicle. Day 4 Tr. 172. Officer Dipentima identified the defendant as that driver in a photo array. *Id*. at 175. Calhoun also testified that the defendant told him he lost the Taurus in a high-speed chase from police in Hampton. Day 6 Tr. 148-49.

Prior to the high-speed chase, the defendant, REDMON, and Calhoun drove in the Taurus to the Ivy Farm Apartments in Newport News on October 1, 2017. Day 6 Tr. 136. The defendant's brother, Ryan Dixie, lived nearby and identified a female drug dealer who lived at the apartment complex. *Id*. at 138. They observed a female that Calhoun identified in Government Exhibit 530K (Angel Vaughn). *Id*. at 139. The group resolved to knock on the woman's door and ask to buy marijuana as pretext for a home-invasion robbery. *Id*. at 140. The defendant was armed with a .22 caliber Uzi, and REDMON had a 1911 .45 caliber handgun. *Id*. The three men knocked on Vaughn's door and forced their way in when she unlocked and partially opened the door. *Id*. at 141. REDMON and Calhoun searched the apartment for drugs and money. *Id*. The defendant held the victim at gunpoint by brandishing the .22 caliber Uzi and pointing it at the back of her head while she lay face-down in the apartment. *Id*. at 141-42. The group stole a Lexus sedan, marijuana, jewelry, money, clothes, and shoes from the victim. *Id*. at 142-43. Calhoun identified

14

a picture of the Lexus sedan as the car taken from the female drug dealer during the robbery. *Id.* at 143; Gov. Ex. 40.

The victim, Vaughn, corroborated Calhoun's account of the robbery. She testified that she was a dealer of marijuana in the fall of 2017. Day 4 Tr. at 79-80. She said she saw the three men who robbed her in a black sedan parked in the parking lot of her apartment complex. *Id.* at 82. Vaughn explained that the robbers pushed in her door as part of a home-invasion robbery. *Id.* She thought they were all African American, but she could not see them well because their faces were covered. *Id.* at 87. One of the robbers had Vaughn lie face down in the apartment with a gun to the back of her head. *Id.* at 88. The man repeatedly threatened to kill her. *Id.* at 90. The same man walked her to the bathroom where he told her to stay and further threatened that if she came out, he was going to kill her. *Id.* at 91. After the robbery, Vaughn went outside and saw the robbers driving away in a black Ford Taurus consistent with the car in Government Exhibit 22 and her Lexus. *Id.* at 91-92.

Calhoun testified that the defendant drove the Taurus until he lost it in the chase on October 9, 2017. *Id.* at 149. After this chase, he drove the stolen Lexus. *Id.* at 150. Both Calhoun and Doane testified in varying details that the defendant and REDMON got into a high-speed chase with the Lexus in Newport News and REDMON was arrested while fleeing from police. Day 6 Tr. 150 (Calhoun); Doane Tr. 26 (Doane). The defendant told Doane about REDMON's arrest and the need for bail money, which served as the motive for the drug robbery of Easley (described above). Doane Tr. 26. The defendant told Calhoun about REDMON because he needed a ride after he escaped police following the chase. Day 6 Tr. 151-52.

Officer Moore of the Newport News Police Department attempted to stop the Lexus on October 11, 2017, at approximately 7:30 p.m. after witnessing the driver turn onto Jefferson

15

Avenue and do a complete 360. Day 4 Tr. 194. The Lexus fled at a high rate of speed to the Warwick Mobile Home neighborhood. *Id*. After the vehicle reached a dead end, the occupants of the Lexus ditched the vehicle and fled on foot. *Id*. Officer Moore located and arrested the passenger of the vehicle, REDMON, hiding under a mobile home. *Id*. at 203-04. Officer Moore correctly identified REDMON in open court during the trial. *Id*.

### F.    Drug Robbery of Christian Stevenson (Precursor to Counts 11-12)

On November 7, 2017, the defendant, BROWN, and Calhoun robbed drug dealer Christian Stevenson (nickname "Cali") at the Slamm Dragon Tattoo in Hampton, taking his Kahr P9 firearm, drugs, and money. Calhoun testified that BROWN put Cali in a headlock while Calhoun and the defendant robbed him of the firearm, drugs, and money. Day 6 Tr. 159. The group had previously run into Stevenson at a convenience store near 454 Hollomon Drive in Hampton (which was the residence of female associates of the defendant and Calhoun).[3] *Id*. at 157. Calhoun's testimony that the group robbed Stevenson of his firearm was corroborated by call-detail records showing three calls from the defendant to BROWN on the evening of the robbery. Gov. Ex. 556 at 2. The call-detail records also reflected two calls from the defendant to Stevenson (ostensibly to set up the drug transaction) in the thirty minutes before the robbery. *Id*. at 4. Finally, the cell-site location information from Verizon showed that a phone associated with the defendant was in the vicinity of the Slamm Dragon Tattoo at the time of the robbery. *Id*.

### G.    Commercial Robbery of Hampton MetroPCS (Counts 11-12)

---

[3] Dedrea Davis leased 454 Hollomon Drive. Day 6 Tr. 30. The defendant, BROWN, and Calhoun frequented this residence. *Id*. at 32. Calhoun was involved with the lessee, Dedrea Davis. *Id*. The defendant was involved with Davis's friend, Tadasia Williams, who regularly stayed there. *Id*. BROWN was introduced to the defendant and Calhoun through Williams and Davis. *Id*. at 15-16.

Approximately one hour after robbing Stevenson of the firearm, the defendant, BROWN, and Calhoun robbed the MetroPCS located on Mercury Boulevard in Hampton (as charged in Counts 11-12). The defendant brandished the Kahr P9 firearm, BROWN retrieved the money from the cash register, and Calhoun stole the deposit bag containing approximately $2,500 from the safe in the back of the store. Day 6 Tr. 165. After the robbery, police officers from Hampton Police Division obtained surveillance of the robbery confirming that there were three robbers, and one brandished a firearm. Day 6 Tr. 52-54; Gov. Ex. 244.

**H.    Shooting of Kelcey Wellons and Jaison Brooks (Count 13)**

On November 8, 2017, Calhoun testified that he and the defendant rented a blue BMW SUV from Michael Rogers. *Id*. at 168-69. Rogers corroborated Calhoun by testifying that he rented his BMW to the defendant (who he knew by the nickname Bone), and that he remembered another man matching Calhoun's description being around Bone at that time. Day 5 Tr. 10-11.

After obtaining the blue BMW on November 8, Calhoun and the defendant dropped Rogers at a night club in Newport News and drove the vehicle toward the downtown area. Day 6 Tr. 169-70. The defendant observed a pedestrian walking near the intersection of 23rd Street and Wickham Avenue and directed Calhoun to pull over. *Id*. at 171. The defendant asked the pedestrian for a cigarette. *Id*. at 172. When the man turned his head, the defendant pointed the Kahr P9 handgun to his head and shot him. *Id*. The defendant shot the man again with the Kahr P9 two more times in the head area as he fell. *Id*. at 174. After the shooting, the defendant bragged to Calhoun that he was "Mr. Wavy 10" because he was always on the local news, wanted that many shootings (10) to his name, and considered the shooting "practice." *Id*. at 175-76. Police officers from Newport News Police Department responded to this scene, identified the victim as Kelcey Wellons, and

located cartridge casings.  Day 7 Tr. at 29-33; Gov. Ex. 262 (picture of two casings from ammunition used to shoot Wellons).

Only minutes after the shooting of Wellons, the defendant, and Calhoun stopped at the Cottage Grove apartments in Newport News when they saw a man sitting in a red Hyundai sedan. Day 6 Tr. 176-77.  The defendant told Calhoun it was his turn and handed him the Kahr P9 firearm. *Id.* at 179.  The defendant approached the man and asked to use his phone.  *Id.*  Calhoun approached from the back of the vehicle, brandished the Kahr P9, and shot at the victim.  *Id.*  The defendant grabbed the Kahr P9 and continued to fire at the victim.  *Id.*  As the defendant fired at the victim, he screamed "F**** 12," which Calhoun testified was an expression that meant "F*** the police." *Id.* at 181.  Police officers from Newport News Police Department responded to the scene and identified the victim as Jaison Brooks.  *Id.* at 62-63.  Police recovered five cartridge casings and one bullet from the scene of the shooting of Jaison Brooks, and a medical professional recovered two ammunition components from Brooks' body.  *Id.* at 73 (admission of five casings and bullet) and 85 (two bullets from body).

The victim, Brooks, corroborated Calhoun's account of the shooting.  He fortunately lived and testified that he was sitting in his car when a man approached and asked to use his phone.  Day 7 Tr. 49.  After being asked if he saw the man in court who approached him that night, he identified the defendant.  *Id.* at 50.  Brooks eventually got out of his car and looked down to make the call for the defendant.  *Id.* at 52.  At this point, he heard a shot and felt immediate pain in his stomach. *Id.* at 52-53.  Brooks identified himself as an officer, and the defendant responded that he "didn't give a f***" and repeatedly fired at him.  *Id.*  On November 17, 2017, Detective Thornton from the Newport News Police Department showed Brooks a photo array at Riverside Hospital.  *Id.* at

107. Brooks identified the defendant as the shooter, and remarked, "he is definitely the shooter." *Id*.

## I. Felon in Possession of Firearm for Murder of Nathaniel Davis, attempted robbery of Marcus Morgan, and murder of David Jackson (Count 16)

On November 10, 2017, the defendant, BROWN, REDMON, and Calhoun illegally possessed the Kahr P9 firearm and ammunition, which they used in the murder of Nathaniel Davis, the attempted robbery of Marcus Morgan, and the murder of David Jackson (as charged in Count 16).

Calhoun testified that while driving a blue BMW rented from Mike Rodgers on November 10, 2017, the group observed a Cadillac sedan that was running and unoccupied outside of an ABC Store in Newport News. Day 6 Tr. 187. The defendant gave BROWN the Kahr firearm to defend himself as necessary. *Id*. at 190. BROWN stole the Cadillac and attempted to depart the parking lot, but he hit Nathaniel Davis's vehicle. *Id*. BROWN continued driving away in the Cadillac and Davis followed him in a blue Mercury Grand Marquis to a nearby parking lot in the Stoney Creek Shopping Center. *Id*. at 191. Davis was on the phone with his girlfriend, Tiara Frazier, at the time. Frazier testified that he provided her the license plate information for the Cadillac, which she contemporaneously documented. Day 7 Tr. 174. She also overheard Davis say, "How are you going to hit my car and drive off?" *Id*. at 175. In response, BROWN confronted and shot Davis who was in the driver's seat of the Grand Marquis. Day 6 Tr. 192. Law enforcement from Newport News Police Department recovered a cartridge case from the scene of the murder, and a medical professional recovered a bullet from Davis's body. Day 7 Tr. 203-04 (crime scene technician on casing); *id.* at 212 (recovery of bullet); Gov. Ex. 58 (bullet). Investigators also recovered paint transfer samples from the front passenger bumper of the Cadillac and the rear driver's side door of the Mercury Grand Marquis, which corroborated Calhoun's account of a collision preceding the

shooting.  *Id.* at 218; Gov. Ex. 415, 417.  Forensic Scientist Brown testified that there was paint transfer consistent with a collision between the Cadillac and the Mercury.  Day 8 Tr. 131.  Calhoun testified that BROWN fled the scene of the murder and departed the area in the blue BMW with the defendant, REDMON, and Calhoun.  Day 6 Tr. 192.

Approximately one hour later, on November 10, 2017, the defendant, BROWN, REDMON, and Calhoun attempted to rob Marcus Morgan in the area of 11202 Terrell Lane in Hampton and engaged in another shooting.

Calhoun testified that the group was driving around Hampton and found Morgan exiting a Lexus sedan in possession of a backpack.  Day 6 Tr. 196.  The defendant handed BROWN the loaded Kahr firearm for the robbery.  *Id.*  BROWN approached Morgan from behind and demanded money.  *Id.*  He fired the Kahr firearm once at Morgan.  *Id.*  BROWN and Morgan got into a physical altercation near the stairs of his nearby apartment complex.  *Id.* at 197.  REDMON and the defendant exited the blue BMW to assist BROWN and retrieve the firearm.  *Id.*  At this time, Morgan returned fire at the group with his own firearm.  *Id.* at 198-99.  BROWN, REDMON, and the defendant fled the scene with Calhoun driving the blue BMW.  *Id.* at 198.

The victim, Morgan, corroborated Calhoun's account of the shooting.  Morgan testified that he was returning home for the evening when someone approached him from behind and brandished a firearm.  Day 8 Tr. 20.  When he told the man to "stop playing," the man fired at him. *Id.* at 21.  Morgan fled toward his residence and became entangled in a physical altercation with the man.  *Id.*  Two men came to help the person who had initially shot at him, but Morgan used his own firearm to drive them away by firing at the men.  *Id.* at 23-24.

After fleeing the scene of the Morgan shooting, BROWN claimed that he only shot once at Morgan because the P9 Kahr jammed.  Day 6 Tr. 199.  This frustrated the defendant who insisted

that his gun did not jam. *Id.* Calhoun was driving the group around Newport News in the vicinity of 82nd Street when the defendant saw a pedestrian and directed him to pull over. *Id.* at 199-200. The pedestrian, David Jackson, was homeless. *Id*. at 201. The defendant asked Jackson for directions. *Id*. at 202. When Jackson turned to provide directions by pointing, the defendant put the gun to his head and shot him, killing him. *Id*. The defendant fired again two more time as the victim fell. *Id*. at 203. The defendant yelled at BROWN, "I told you this gun don't jam and you're lying." *Id*. The group got back in the BMW and fled the scene. *Id*. at 204. The police responded to the scene and recovered six cartridge casings and a bullet. Day 7 Tr. 246; Gov. Ex. 448, 450, 452, 454, 456, 458, and 463. A medical professional recovered bullets and a bullet fragment from the body of Jackson. *Id.* at 255; Gov. Ex. 467, 469, 471, and 472.

### J.    Commercial Robbery of Newport News MetroPCS (Counts 17-18)

On November 11, 2017, the defendant, BROWN, and Calhoun robbed an authorized retailer for MetroPCS in Newport News, Virginia.

Calhoun testified that he did not enter the store because he was worried that Cooper's significant other, Jessica Socheata, would recognize him. Day 6 Tr. 207-08. Calhoun drove the defendant and BROWN to the robbery and waited in the getaway vehicle, the blue BMW, behind the shopping center. *Id*. at 206. The defendant and BROWN robbed the MetroPCS store using the Kahr firearm. *Id.* at 208. When they got back to the BMW, Calhoun said they missed the deposit bag and only had a few dollars. *Id.* Calhoun's account was corroborated by testimony from a customer in the store, Richard Jackson, and the store manager, Christopher Fitzgerald. Fitzgerald recalled that two black men robbed the store that evening and that the lighter skinned man brandished a firearm. Day 8 Tr. 56. Jackson testified that two men robbed the store with one firearm and threatened his wife and minor children. *Id*. at 63. The defendant and BROWN took

proceeds from the business and more money from a customer who was present in the store. *Id.* at 57.

### K.    Key Ballistic and Phone Evidence

Like the Ruger before, the firearm used in all these later scenes was linked to a common firearm, the Kahr P9. Forensic Scientist Lake analyzed and tested the cartridge casings and ammunition components recovered from the above crime scenes (involving the Kahr P9) and concluded that they were all fired from the same firearm. Day 8 Tr. 150. Ms. Lake further testified that the general rifling class characteristics like those present on some of the ammunition components described above are associated with Kahr Arms, caliber 9mm Luger firearms, among others. *Id.* at 142, 146.

Investigative Analyst Paul Swartz testified regarding the analysis of the phones associated with the defendants. Specifically, he testified that phones associated with Calhoun, the defendant, and BROWN were in the vicinity of the MetroPCS in Hampton around the time of the robbery on November 7, 2017. Day 7 Tr. 273-74; Gov. Ex. 557 at 2-4. With respect to the shooting of Kelcey Wellons on November 8, 2017, the phone associated with the defendant was in the vicinity of 23rd and Wickham at approximately 9:20 p.m. when the shooting happened. Day 7 Tr. 282; Gov. Ex. 560 at 5. The phone associated with the defendant thereafter moved to the Cottage Grove apartments at approximately 9:31 p.m. where the shooting and attempted robbery of Jaison Brooks happened. Day 7 Tr. 282; Gov. Ex. 560 at 6. On the evening of the Miller Mart robbery on November 9, 2017, the defendant called BROWN about two hours before the robbery, and a phone associated with Calhoun was in the vicinity of the Miller Mart at the time of the robbery. Day 7 Tr. 285-86; Gov. Ex. 561 at 2, 4. With respect to the shootings on November 10, 2017, phones associated with the defendant and BROWN were in the vicinity of the scene of the shooting of

Nathaniel Davis at the Stoney Creek Shopping Center in Newport News and the defendant attempted to call BROWN two times at 10:00 p.m. and 10:01 p.m. (ostensibly while BROWN was stealing the Cadillac). Day 7 Tr. 288; Gov. Ex. 562 at 5, 8. Finally, with respect to the MetroPCS robbery on November 11, 2017, BROWN texted the defendant, "we got one more play too make" at 5:06 p.m. on the evening of the robbery – just before the robbery that evening. Day 7 Tr. 294; Gov. Ex. 563 at 8. And the defendant's phone was in the vicinity of the Denbigh area MetroPCS in Newport News just before the robbery. *Id*. at 4.

## GENERALIZED OBJECTION

The defendant lodged a generalized objection with Probation to all the offense conduct described in paragraphs 29 through 71 of the PSR and the information derived from the records of the Northern Neck Regional Jail related to his 24 incident reports of misconduct between August 21, 2023, and October 17, 2023. PSR ¶ 22. In addition, without providing any legal reasons, he objects to the guideline applications and calculations reflected in the PSR. These arguments lack merit.

The defendant and two of his codefendants chose to plead not guilty and went to trial. The United States presented lengthy evidence against each defendant. The United States relies on the evidence introduced at trial that establishes beyond a reasonable doubt the defendant's role in each separate crime. The jury was properly instructed on each element of these separate crimes.

The evidence related to these crimes contained in the PSR was properly included. The mere fact that the PSR may include evidence not used at trial, but found in the United States' files, is also of no matter.[4] According to Title 18, U.S.C. § 3661 states, "No limitation shall be placed

---

[4] The bulk of the information contained in the PSR came from the trial record. The only exception is the information relates to the records contained in the Northern Neck disciplinary records.

on the information concerning the background, character, and conduct of a person convicted of the offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The sentencing guidelines have a similar mandate in § 6A1.3(a), "…the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy."

The Fourth Circuit has held that a defendant must do more than merely contest the information in the PSR. "The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable and articulate the reasons why the facts contained therein are untrue or inaccurate." *See United States v. Fowler,* 58 F.4th 142, 151 (4th Cir. 2023)*; United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (citing *United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990) (finding that defendant presented no evidence in rebuttal to PSR)); *see also United States v. Randall*, 171 F.3d 195, 211 (4th Cir. 1990); and *United States v. Powell*, 650 F.3d 388, 394 (2011). Without an affirmative showing that the PSR is inaccurate, the Court is "free to adopt the findings of the [presentence report] without more specific inquiry or explanation." *Fowler*, 58 F.4th at 151; *Terry*, 916 F.2d 162 (quoting *Mueller*, 902 F.2d at 346). The burden is on the defendant to establish inaccuracy or unreliability. *Id.* Indeed, the defendant's conclusionary assertion he plead not guilty is insufficient to prevent the Court from adopting the findings of the PSR. *United States v. Hoover*, 95 F.4th 763, 776 (4th Cir. 2024).

Regarding the activities at Northern Neck, in addition to the reports relied upon in the PSR the Court heard testimony about the defendant's behavior including a threat made to an official during a hearing.

24

## OTHER UNRESOLVED OBJECTIONS

DIXIE objects to applying the enhancement for reckless endangerment during flight from U.S.S.G. § 3C1.2. PSR ¶ 81. During the October 1, 2017, robbery of Angel Vaughn, the defendant drove a Ford Taurus to the scene of the robbery and departed in Vaughn's Lexus. On October 9, 2017, the defendant engaged in a high-speed chase from Hampton Police in the stolen Taurus which gave rise to the enhancement. PSR ¶ ¶ 30-33. In addition, on October 11, 2017, the defendant and REDMON engaged in another high-speed chase in the stolen Lexus, where Newport News police apprehended REDMON and the defendant escaped. PSR ¶ 34. The defendant argues that the reckless endangerment enhancement does not apply because of the time lapse between the home invasion robbery and the high-speed pursuits where the defendant drove, eluded police, escaped, and then abandoned the stolen cars. This argument lacks merit.

### A.    The Relevant Conduct provisions of the U.S.S.G. § 1B1.3 apply to the application of the reckless endangerment provisions of U.S.S.G. § 3C1.2.

The fact that the high-speed pursuit was on a separate date after the home invasion is of no consequence because it constitutes relevant conduct that occurred as DIXIE sought to avoid detection for his participation in the Vaughn robbery. The relevant conduct provisions of the U.S.S.G. § 1B1.3 apply to the application of the reckless endangerment provisions of U.S.S.G. § 3C1.2. *United States v. Chong*, 285 F.3d 343, 346 (4th Cir. 2002). In pertinent part § 1B1.3 states that relevant conduct includes:

> all acts and omissions, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant… that occurred during the commission of the offense of conviction, in preparation for that offense, or *in the course of attempting to avoid detection or responsibility for that offense*.

(emphasis added). Avoiding detection or responsibility for the offense provides a nexus between the pursuit and the underlying offense. *United States v Dial*, 524 F.3d 783, 786-87 (6th Cir. 2008)

("The general principals of the guidelines require sentencing courts to consider acts and omissions regarding the offense for which the defendant was convicted").

Consequently, although the language of the reckless endangerment provision does not contain a nexus requirement between the flight and the offense of conviction, courts recognize that there must be a sufficient nexus between the underlying offense and the reckless flight. *United States v Dial*, 524 F.3d 783, 786-787 (6th Cir 2008) (citing with approval *United States v. Southerland* 405 F.3d 263, 268 (5th Cir. 2005)).[5] *See also United States v. Searcy* 108 F.3d 1374 (4th Cir. 1997) (nexus requirement between crime of conviction and reckless endangerment because of relevant conduct provisions and upholding enhancement because defendant fled to continue drug conspiracy).

These cases hold that the Court should look to the defendant's state of mind during the flight to determine if such a nexus exists. *Dial*, 524 F.3d at 788. In discerning state of mind, courts look, in part, to geographic and temporal proximity between the flight and the underlying offense. *Id*. Finally, the underlying offense need not cause the reckless flight. *Id* at 787. ("The government need not demonstrate that the underlying offense caused either the reckless endangerment during flight or the flight itself") *Id*.

 In other words, to apply the enhancement under U.S.S.G. § 3C1.2, the government must show by a preponderance of the evidence that the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, and (5) that this conduct "occurred during the commission of the offense, in

---

[5] In *Southerland*, the Fifth Circuit held the reckless endangerment conduct was insufficiently connected to the bank robbery conviction because the government failed to prove the flight occurred in the course of attempting to avoid detection for or responsibility for that offense. 405 F.3d at 268. Unlike the present case, Southerland involved a completed offense not a continuing offense as the Hobbs Act conspiracy.

preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. *Dial*, 524 F.3d at 786-787.

In the instant case, the defendant ostensibly does not dispute that the high-speed pursuits created a substantial risk of bodily injury. The case law establishes that "the endangerment of the lives of law enforcement officers and innocent bystanders" is sufficient to support the enhancement. *United States v. Buie*, 441 Fed Appx. 173, 177 (4th Cir. 2011) (engaging in a high-speed chase through residential streets is enough to create a serious risk of serious bodily injury); *United States v. Whitaker*, 40 Fed Appx 827 (4th Cir. 2002). Under this enhancement, acts are considered "reckless" when the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard the risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. *United States v. Carter*, 601 F.3d 252. 255 (4th Cir. 2010).

Here, the defendant recklessly created a substantial risk of death or serious bodily injury to another person while fleeing from a law enforcement officer. U.S.S.G. § 3C1.2. This enhancement is "construed broadly and includes preparation for flight," as well as "conduct that occurs in the course of resisting arrest." U.S.S.G. § 3 C1.2 cmt. Note 3. The enhancement requires more than "active willful misbehavior" as opposed to "mere flight from an arresting officer" or "disagreeableness during an encounter." *United States v Brown*, 765 Fed Appx. 902, 909, (4th Cir. 2019) (citing *United States v. John*, 644, 648 (4th Cir. 1991)). Thus, the enhancement requires flight plus something more. *United States v Dennings*, 922 F.3d 232, 237 (4th Cir. 2019)

The fact that the high-speed pursuit occurred eight days after the October 1, 2017, home invasion is of no consequence because it constitutes relevant conduct that occurred as DIXE sought to avoid detection for his participation in the Vaughn robbery. DIXIE engaged in the high-speed

pursuit in the Ford Taurus, the exact vehicle he had stolen to commit the Vaughn robbery and driven with his coconspirators to the crime scene. His coconspirators also used that same vehicle as a getaway car to flee the scene, while DIXIE drove away in the stolen Lexus.

In DIXIE's mind, he had a great incentive to escape from police to avoid responsibility for the offense. If the police had recovered of the stolen Taurus with him as the driver, it would have implicated him in the Vaughn robbery. Further, the October 9, 2017, flight relates to not only to avoiding liability for the underlying offenses related to the Vaughn home invasion but also to avoiding detection for the ongoing Hobbs Robbery Conspiracy that he was a participant. *Dial*, 534 F.3d at 788-89. DIXIE's flight from police occurred during the conspiracy's existence and in areas where the conspiracy operated. The Hobbs Act conspiracy continued well into November 2017. Therefore, the defendant's objection to the enhancement should be denied.

## NOTICE OF VICTIM IMPACT STATEMENTS

The United States hereby provides notice that several victims would like to have an opportunity to address the Court during the defendant's sentencing.

## POSITION ON SENTENCING AND ARGUMENT

Pursuant to the United States Sentencing Guidelines and the factors under Title 18, United States Code § 3553(a), he United States respectfully requests that the Court impose a total sentence of five consecutive life sentences plus 60 years of incarceration. Although well summarized herein, the Court is well familiar with the facts of this case and the defendant's role in these crimes.

Prior to sentencing the defendant, the Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, in 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 150 (2009). Title 18, United States Code, Section

3553(a) provides that in determining a sentence the court must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in the statute include the need for sentences to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence for the criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.

### A.     Nature and Circumstance of Offenses

The nature and circumstances of the offenses of conviction could not be worse. The evidence adduced at trial demonstrated that the defendant committed four cold-blooded murders. Each killing was inexcusable and premeditated. In addition, he participated in an armed home invasion drug robbery and two other commercial robberies. To prepare for the robberies, the defendant and his coconspirators stole a Ford Taurus. They were not done. They also stole a Kahr firearm from a drug dealer to use in future robberies. The defendant, as a convicted felon, could not legitimately obtain a firearm, so he and his coconspirators – likewise convicted felons – resorted to what they knew, robberies and violence. The defendant also engaged in two dangerous flights from the police in stolen vehicles to avoid apprehension. In addition, on November 8, 2017, and again on November 10, 2017, the defendant and various coconspirators engaged in a joint enterprise centered on their shared illegal firearm possession and marauded through Newport News and Hampton, where they murdered, robbed, and fired at victims at an astonishing rate.

The defendant committed four cruel murders as the triggerman. In each criminal event, the defendant illegally possessed the firearm and ammunition. During the Happy Shopper robbery, the defendant mercilessly executed Darrell Higginbotham, who lay prone in the parking lot on his

stomach. The defendant's cruelty is depicted on the chilling surveillance video of the muzzle flash of the firearm ending Higginbotham's life. Less than twenty-four hours earlier, the defendant murdered Taari Johnson by shooting him off his motorcycle. The defendant stopped his vehicle, walked over to Mr. Johnson, and fired at him again as he lay on the road dying. The defendant and REDMON then ran his pockets to take his wallet and anything of value.

On November 7, 2017, the defendant and his coconspirator obtained the Kahr firearm by robbing a drug dealer at the Slamm Dragon Tattoo parlor and an hour later using the weapon to rob the Hampton Metro PCS. PSR ¶ 57-58. The next day, on November 8, 2017, the defendant murdered Kelcey Wellons, bragging he was "Mr. Wavy 10," wanted ten bodies to his name, and considered the shooting "practice." PSR ¶ 61. Minutes after killing Mr. Wellons, the defendant and his coconspirator Calhoun shot Correctional Officer Jaison Brooks. When the victim identified himself as a Correctional Officer, DIXIE uttered an expression meaning "f*** the Police." PSR ¶ 62. It would be difficult to conjure stronger evidence of a defendant's lack of respect for the law.

The defendant was not done. On November 10, 2017, the defendant, REDMON, BROWN, and Calhoun continued their armed marauding, resulting in Brown's murder of Nathanial Davis, the attempted robbery of Marcus Morgan, and the defendant murdering David Jackson. The defendant callously committed this latter murder to demonstrate to BROWN that the firearm worked and had not jammed during the Morgan incident. PSR ¶ 65-69. The Jackson murder evidenced that the defendant had such a low opinion of human life that he killed to demonstrate a firearm functioned. In short, the defendant's convictions show incredibly violent behavior, profound victim impact, and that the defendant is a menace to society when he is not in prison. The murders and shootings were senseless and cruel. The defendant's blizzard of violence demonstrates that he is not fit ever to be released or to be at large.

30

### B.    Defendant's History and Characteristics

The defendant is a 32-year-old man with a criminal record that dates back to his teenage years. The defendant did not obtain criminal history points for many older offenses because of the elapse of time. The PSR shows that the defendant has had little meaningful employment as a productive member of society. Instead, he is a Criminal History Category V based upon 10 criminal history points including the commission of the instant offenses while under a criminal justice sentence. PSR ¶ 177-178. Notably, the defendant was not assessed criminal history points for the Malicious Wounding conviction because it was part of Count 16. PSR ¶ 174. The defendant's two prior federal convictions in 2012, for transporting a stolen vehicle, and in 2016, for felon in possession of a firearm, were included in his criminal history. PSR ¶ ¶ 170 and 173. The 2012 conviction also involved the defendant and REDMON fleeing from police after a car chase with speeds up to 121 MPH. PSR ¶ 170. Together with the convictions in the instant case, it is clear the defendant's prior judicial sentences have not deterred him and that he lacks respect for state or federal law.

The defendant learned nothing from his prior experience in the criminal justice system as shown by his similar conduct on two occasions in the instant case. The defendant's supervision in the 2012 case was revoked for among other reasons, committing a new crime or crimes and associating with a convicted felon without permission of his probation officer. *Id*. Likewise, following his second federal conviction, his adjustment to supervision was poor and included the sentence for Malicious Wounding related to the Correctional Officer. PSR ¶ 173. Further, while in the Virginia Department of Corrections, between September 11, 2020, and May 19, 2022, the defendant violated numerous prison rules, evidencing a clear disrespect for authority. *Id*. His prior experience with the criminal justice system, including the federal system, has not deterred the

defendant. His disturbing criminal behavior has only increased in its level of violence.

The PSR shows that the defendant experienced discreditable contacts with law enforcement which did not result in conviction. Under U.S.S.G. § 4A1.3, for purposes of an upward departure, "a prior arrest record itself shall not be considered." However, the Court "must rely upon the facts underlying the arrests. *United States v. Dixon*, 318 F.3d 585, 591 (4th Cir. 2003).

The defendant's appalling conduct while in pre-trial detention further shows his menacing behavior, a refusal to respect authority, and adapt to the institution's rules. Many individuals who face serious federal charges seek to conform to the rules to appear favorable to the sentencing judge. Many violent offenders adapt to the structure of pre-trial confinement. The defendant's actions show that even in the structured setting of pre-trial detention, he cannot follow the rules and accordingly presents a danger to other inmates and staff.

C.      **Request for Consecutive Sentence**

The PSR reflects that a Newport News Circuit Court sentenced DIXIE to 20 years of incarceration for the Malicious Wounding of Jaison Brooks, with a projected release date of July 6, 2037. PSR ¶ 174. The United States requests that the defendant's sentence for the charges in the Second Superseding Indictment run consecutive to the unexpired state court sentence.

The Court may order a federal sentence to run concurrent or consecutive because sentencing judges "have discretion to select whether the sentences they impose will run concurrently with respect to other sentences they impose or that have been imposed in other proceedings." *Setser v. United States*, 566 U.S. 231, 236 (2012). The *Setser* Court relied upon Title 18, U.S.C. § 3584 (a), which allows the Court to apply the § 3553(a) factors to impose a federal sentence concurrently or consecutively to an undischarged term of imprisonment. Here, the state sentence has already been imposed and the Court has the power to run the federal sentence

consecutive to the state sentence.

The government is also mindful that U.S.S.G. § 5G1.3(c) provides that if "a state term is anticipated to result from another offense that is relevant conduct to the instant offense of conviction… the sentence for the instant offense of conviction shall be imposed to run concurrently to the anticipated term of imprisonment. However, because the guidelines are advisory, the Court, after considering the 18 U.S.C. § 3553 (a) factors, may still, in its discretion run the sentences consecutively. *United States v Lynn*, 912 F3d 212, 217 (4th Cir. 2018).

In this case, the Jaison Brooks shooting constituted relevant conduct to the conviction in Count 13. This offense involved the defendant's illegal possession of a firearm and ammunition on November 7, 2017. The shooting of Brooks was not the only crime that day. The defendant also used that firearm and ammunition to senselessly murder Wellons only minutes before the shooting of Brooks. There has been no judicial vindication for Wellons and his family for that murder. Running the sentence concurrent because of the state case involving Brooks misses that Wellons was an independent basis for that offense that has no overlap with the state prosecution. A consecutive sentence would more fully reflect the seriousness of the conduct in Count 13 and help vindicate the crimes committed against these other individuals.

## CONCLUSION

For the foregoing reasons and others to be provided during the sentencing hearing, the United States respectfully requests the Court impose five consecutive life sentences plus 60 years of incarceration.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:       _____/s/_____
Lisa R. McKeel
Assistant United States Attorney
United States Attorney's Office
One City Center
11815 Fountain Way, Suite 200
Newport News, VA 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
lisa.mckeel@usdoj.gov

By:       _____/s/_____
D. Mack Coleman
Assistant United States Attorney
United States Attorney's Office
One City Center
11815 Fountain Way, Suite 200
Newport News, VA 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
mack.coleman@usdoj.gov

By:       _____/s/_____
Howard J. Zlotnick
Special Assistant United States Attorney
United States Attorney's Office
One City Center
11815 Fountain Way, Suite 200
Newport News, VA 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
howard.zlotnick@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of January 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to the following:

David Good
780 Lynnhaven Parkway Suite 400
Virginia Beach, Virginia 23452

Charles Gavin
1409 Eastridge Road
Richmond, Virginia 23229

I HEREBY CERTIFY that on this 10th day of January 2025, I sent a true and correct copy of the foregoing to the following by electronic mail:

Christopher Zychowski
Senior U.S. Probation Officer
701 East Broad Street, Suite 1150
Richmond, Virginia 23219

            /s/
_____
D. Mack Coleman
Assistant United States Attorney
Eastern District of Virginia
Newport News Division
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
mack.coleman@usdoj.gov
